IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Cheryl Stanton,                                 :
                    Petitioner                  :
                                                :       No.  700 C.D. 2019
            v.                                  :
                                                :       Submitted:  March 26, 2020
Unemployment Compensation                       :
Board of Review,                                :
                    Respondent                  :


BEFORE:    HONORABLE P. KEVIN BROBSON, Judge
           HONORABLE PATRICIA A. McCULLOUGH, Judge
           HONORABLE J. ANDREW CROMPTON, Judge


*OPINION NOT REPORTED*

MEMORANDUM OPINION
BY JUDGE McCULLOUGH                             FILED:  May 6, 2020


            Cheryl Stanton (Claimant) petitions for review of the April 30, 2019 order

of the Unemployment Compensation Board of Review (Board), which found Claimant

ineligible for unemployment compensation (UC) benefits pursuant to section 402(e) of

the Unemployment Compensation Law (Law).[1]  The Board's order reversed a referee's

decision that found Claimant eligible for UC benefits.

            Claimant worked as a full-time estimator for Tamco Collision, Inc.

(Employer) from March 12, 2018, to November 6, 2018, at a final rate of pay of

---

[1] Section 402(e) of the Law, Act of December 5, 1936, Second Ex. Sess., P.L. (1937) 2897, *as amended*, 43 P.S. §802(e).  Section 402(e) provides that "an employe shall be ineligible for compensation for any week . . . [i]n which [her] unemployment is due to [her] discharge or temporary suspension from work for willful misconduct connected with [her] work, irrespective of whether or not such work is 'employment' as defined in this act."  43 P.S. §802(e).

$65,000.00 per year. (Findings of Fact (F.F.) No. 1; Certified Record (C.R.) at Item No. 10, Notes of Testimony (N.T.), 2/6/19, at 7.) On November 6, 2018, Claimant was discharged for unsatisfactory work performance and inability to perform her job. (F.F. No. 16; N.T, 2/6/19, at 9.)

Claimant applied for UC benefits and on December 12, 2018, a local service center found her ineligible for benefits under section 402(e) of the Law. (C.R. at Item No. 6.) In particular, the local service center determined Claimant was discharged for unsatisfactory work performance, she did not work to the best of her ability, and she had been warned about her unsatisfactory work performance. *Id.*

Claimant appealed and, following a continuance of the first hearing to permit Employer to obtain counsel, a referee conducted a hearing on February 6, 2019, at which Claimant and two witnesses on behalf of Employer testified. After the hearing, the referee issued a decision, finding Claimant eligible for UC benefits. In her decision, the referee concluded that the hearing record established that Employer discharged Claimant for her "inability to do the job." (Referee decision at 2.) The referee noted that "[E]mployer argued that [Claimant] was counseled on customer service and that she failed to complete continuing education webinars and view videos to improve her performance." *Id.* However, the referee determined that although the record evidence established that Claimant participated in some of the videos and webinars, "the busy work environment did not provide [Claimant] the ability to complete all the continuing education opportunities." *Id.* Thus, the referee concluded that Employer did not provide sufficient evidence to meet its burden that Claimant's inability to perform her job duties was intentional and deliberate and rose to the level of willful misconduct. (Referee decision at 3.) Accordingly, the referee found that Claimant was not ineligible for benefits under section 402(e) of the Law. *Id.*

Thereafter, Employer appealed the referee's decision to the Board. By decision dated April 30, 2019, the Board reversed the referee's decision and found Claimant ineligible for UC benefits. The Board made the following, pertinent, findings of facts:

2. By signature dated March 12, 2018, [Claimant] acknowledged that she received and reviewed the employee handbook.

3. The employee handbook provides that employees must wear a uniform t-shirt. [Claimant] wore the t-shirt for a week or two only. [Employer] discussed the t-shirt with [Claimant], but she did not wear it.

4. In June, July and August 2018, [Employer] held coaching sessions with [Claimant] to improve her customer service.

5. [Employer] directed its employees to watch webinars about customer service and writing estimates for insurance companies. [Claimant] watched 1 of approximately 21 webinars about writing estimates.

6. [Employer] offered the employees the opportunity to watch the webinars at work or to leave work early and watch the webinars on a tablet that it provided. The webinars lasted 15 to 45 minutes.

7. [Employer] specifically directed [Claimant] to watch a live webinar about customer service, but she did not comply. [Employer] directed [Claimant] to watch the recording of the live webinar, but she did not comply.

8. [Employer] expected its employees to contact every customer with a vehicle on its lot on Tuesdays and Thursdays. [Employer] frequently asked [Claimant] to contact the customers. If [Employer] did not ask [Claimant] to contact the customers, she did not do it.

9. [Employer] lost money because [Claimant] did not accurately estimate the cost to repair vehicles.

10. [Employer] discharged [Claimant] for unsatisfactory performance.

(F.F. Nos. 2-10.)

In its decision, the Board noted that although the referee accepted as credible Claimant's testimony that she was too busy at work to view the videos and webinars that Employer expected employees to watch to improve performance, the referee did not address Claimant's option to leave work early and watch the webinars on a tablet or Claimant's refusal to comply with Employer's other directives. (Board decision at 2.) The Board observed that "[m]ere incompetence, inexperience, or inability to do one's job does not constitute willful misconduct." *Id.* However, the Board explained that "a refusal to try to improve performance may constitute willful misconduct, and where an employer makes a reasonable request, the employee has an obligation to carry out that request." *Id.*

The Board determined that Employer met its burden to show that Claimant engaged in willful misconduct because Employer's "witnesses testified that [Claimant] refused to comply with [Employer's] directives that she watch webinars to try to improve her performance." (Board decision at 3.) The Board also concluded that because Employer "offered its employees the option to leave work early to watch the webinars, [Claimant's] argument that she did not have time to watch them at work [was] not persuasive." *Id.* Additionally, the Board found that Claimant "refused to comply with [Employer's] directives about its uniform and contacting its customers." *Id.* The Board "resolve[d] the conflicts in the testimony, in relevant part, in favor of

4

[Employer] and [found] the testimony of [Employer] and its witnesses to be credible."[2] *Id.* Therefore, the Board held that Claimant was ineligible for benefits under section 402(e) of the Law.[3] *Id.*

Claimant now petitions this Court for review of the Board's order,[4] arguing the Board erred in concluding that Claimant engaged in willful misconduct based on her failure to wear a work t-shirt and complete the assigned webinars. Essentially, Claimant argues that certain findings of fact are unsupported by substantial evidence in the record and that the Board erred as a matter of law in concluding that Claimant's poor work performance constituted willful misconduct.

Initially, we note that in UC cases, the Board's findings of fact must be supported by "[s]ubstantial evidence [which] is defined as 'such relevant evidence which a reasonable mind would accept as adequate to support a conclusion.'" *Western & Southern Life Insurance Co. v. Unemployment Compensation Board of Review*, 913 A.2d 331, 335 (Pa. Cmwlth. 2006) (quoting *Guthrie v. Unemployment Compensation Board of Review*, 738 A.2d 518, 521 (Pa. Cmwlth. 1999)). "The Board's findings are

---

[2] On appeal to the Board, Employer also argued that the referee erred by excluding evidence that Employer offered to impeach Claimant's credibility. However, because the Board did "not find [Claimant's] testimony credible," it determined that it was unnecessary to address whether the referee erred in excluding Employer's impeachment evidence. (Board decision at 3.)

[3] The Board further ordered recoupment of $1,641.00 as a fault overpayment under section 804(a) of the Law, 43 P.S. § 874(a). Relevantly, section 804(a) of the Law reads: "Any person who by reason of [her] fault has received any sum as compensation under this act to which [she] was not entitled, shall be liable to repay to the [UC] Fund to the credit of the Compensation Account a sum equal to the amount so received by [her] and interest at the rate determined by the Secretary of Revenue . . . ." *Id.*

[4] Our review of the Board's decision "is limited to determining whether the necessary findings of fact were supported by substantial evidence, whether errors of law were committed, or whether constitutional rights were violated." *Johns v. Unemployment Compensation Board of Review*, 87 A.3d 1006, 1009 n.2 (Pa. Cmwlth. 2014).

conclusive on appeal so long as the record, when viewed in its entirety, contains substantial evidence to support the findings." *Western & Southern Life Insurance Co.*, 913 A.2d at 335. In determining whether substantial evidence exists for the Board's findings, this Court is bound "to examine the testimony in the light most favorable to the party in whose favor the Board has found, giving that party the benefit of all inferences that can logically and reasonably be drawn from the testimony." *United States Banknote Co. v. Unemployment Compensation Board of Review*, 575 A.2d 673, 674 (Pa. Cmwlth. 1990).

Moreover, in UC cases, "it is well-settled that the Board is the ultimate fact finder and is, therefore, entitled to make its own determinations as to witness credibility and evidentiary weight." *Serrano v. Unemployment Compensation Board of Review*, 149 A.3d 435, 439 (Pa. Cmwlth. 2016). "The Board is also empowered to resolve conflicts in the evidence." *Id.* "'Questions of credibility and the resolution of evidentiary conflicts are within the sound discretion of the Board, and are not subject to re-evaluation on judicial review.'" *Id.* (quoting *Peak v. Unemployment Compensation Board of Review*, 501 A.2d 1383, 1388 (Pa. Cmwlth. 1985)). "The Board is the arbiter of credibility and is free to accept or reject the testimony of any witness in whole or in part." *Ackley v. Unemployment Compensation Board of Review*, 166 A.3d 565, 568 (Pa. Cmwlth. 2017).

Claimant argues that several of the Board's findings of fact are unsupported by substantial evidence in the record. However, we conclude otherwise.

First, with respect to the Board's finding that Claimant failed to wear her t-shirt uniform, Claimant argues that Employer did not establish the existence of a rule requiring employees to wear the t-shirts, that Claimant knew about the rule, or that Claimant was ever warned about her failure to wear a company t-shirt. She contends that Employer only made an issue of Claimant's failure to wear a company t-shirt after she was terminated. Claimant also alleges that the Board erred in finding that the

6

employee handbook provides that employees must wear a t-shirt uniform, where an employee handbook was not entered into evidence at the referee hearing. She, thus, questions the existence of an employee handbook.

In contrast, the Board argues that its findings that Claimant was aware she was required to wear a t-shirt uniform, was warned about her failure to wear the uniform, and still failed to do so, are supported by substantial evidence in the record. The Board also contends that Employer was not required to enter the employee handbook into evidence where both Employer's witnesses and Claimant testified as to the existence of the t-shirt uniform rule.

At the referee hearing, Employer's office manager, Margaret Bonella (Bonella), testified that "[t]here was [sic] uniforms provided that were not worn in compliance with the handbook, that was brought to [my] attention." (N.T., 2/6/19, at 10.) She stated that Claimant's failure to wear a uniform was a contributing factor in her termination. *Id.* When asked about the type of uniform, Bonella stated that "[i]t was a company branded shirt, [t]-shirt." (N.T., 2/6/19, at 12-13.) Bonella testified that she instructed Claimant that she needed to wear the company-branded t-shirt while in the office. (N.T., 2/6/19, at 13.) When asked whether Claimant wore the t-shirt, Bonella replied that Claimant wore it "[f]or an initial week or two, once it was provided, and then stopped." *Id.* In response to a question about whether Claimant refused to wear the shirt beyond that initial period, Bonella stated that "[i]t was brought up in conversation that she needed to, and there was no effort made to wear them after that." *Id.* Additionally, Claimant testified that the uniform consisted of a company-branded t-shirt, but claimed that she wore it every day. (N.T., 2/6/19, at 24.)

Despite Employer not entering the employee handbook into evidence, Bonella's testimony is "such relevant evidence which a reasonable mind would accept as adequate to support a conclusion," *Western & Southern Life Insurance Co.*, 913 A.2d at 335, that employees were required to wear a t-shirt uniform, that Claimant

7

"wore the t-shirt for a week or two only," and that Employer "discussed the t-shirt with [Claimant], but she did not wear it." (F.F. No. 3.) Moreover, while Claimant disputed that she refused to wear the uniform, as the arbiter of credibility, the Board was entitled to credit Bonella's testimony that, even after Claimant received a warning she failed to wear the uniform, over Claimant's contrary testimony. We may not disturb such determination on appeal.

Next, regarding Claimant's alleged failure to complete the webinars, she argues that Employer did not establish a concrete timetable for her to complete the webinars, that there were no written requirements for webinars, and that she never received any warnings regarding her completion of the webinars. Claimant also maintains that the Board ignored her testimony that she was too busy with other work, including answering the phone and handling the front desk, to complete the webinars. Claimant also maintains that there was no evidence in the record that she failed to contact customers and that the Board ignored testimony from Employer's witnesses that Claimant performed her job in a satisfactory manner, as well as documentary evidence showing she had received positive online reviews from customers.

In response, the Board argues that although Claimant claims she was never given a deadline to complete the webinars, Employer specifically instructed her to either watch the live webinar or a recording of it, but that Claimant neglected to do so. Moreover, while Claimant alleges that she was too busy to complete the webinars, the Board notes that it did not find this evidence credible. The Board observes that Employer's witnesses testified that from March to June 2018, Employer did not have any issues with Claimant's job performance. However, the Board asserts that beginning in June 2018, Employer began having concerns about Claimant's customer service and conducted monthly coaching sessions with Claimant to try to improve her performance. In particular, the Board alleges that even though Claimant was told to

8

contact customers who had vehicles parked on Employer's lot, she failed to contact them.

At the hearing, when asked why Claimant was discharged, Bonella testified that Claimant received "several coaching sessions on customer service sales," but they were "not followed through." (N.T., 2/6/19, at 9.) In particular, she claimed that Claimant was given the opportunity to take "customer service information" courses and "continuing education as it pertains to writing estimates for insurance companies," but Claimant did not "follow[] through." *Id.*

In sum, Bonella stated that Claimant was terminated "[d]ue to [her] inability to perform the job." *Id.* Although Bonella recognized that Claimant was able to perform her job effectively from March to June 2018, Employer held coaching sessions with Claimant in June, July, and August 2018 to help Claimant improve her performance. (N.T., 2/6/19, at 9-10, 13.) At all three coaching sessions, Claimant was coached on "[k]eeping customers informed throughout the repair process." (N.T., 2/6/19, at 10.) Additionally, at the August coaching session, Claimant was instructed to complete online customer service webinars. *Id.* While Bonella admitted that no concrete deadline was given to complete *all* of the customer service webinars, she stated that she directed Claimant to complete one specific live webinar by a certain deadline, but that Claimant did not comply with her directive. (N.T., 2/6/19, at 11.) Bonella also testified that she then instructed Claimant to watch a recording of the live webinar, but that Claimant failed to do so. (N.T., 2/6/19, at 12.) On cross-examination, Claimant's counsel asked Bonella if Claimant's other duties precluded her from completing the webinars; however, Bonella explained that Claimant was provided a tablet and was permitted to leave work an hour early in order to watch the webinars at home. (N.T., 2/6/19, at 14.) Bonella testified that the webinars took 15 to 45 minutes to complete. (N.T., 2/6/19, at 17.)

9

When asked to elaborate on Claimant's poor customer service, Bonella stated that she instructed Claimant many times that she needed to call customers every Tuesday and Thursday in order to provide updates on their vehicles. (N.T., 2/6/19, at 12-13.) Bonella alleged that despite Claimant being instructed to contact customers, Claimant only contacted customers "[w]hen prompted and asked," but otherwise did not contact customers. (N.T., 2/6/19, at 12.)

Employer's owner, Tony Dinapoli (Dinapoli), also testified at the hearing. Dinapoli stated that Claimant was terminated for "poor work performance." (N.T., 2/6/19, at 18.) Dinapoli stated that, in addition to the customer service webinars, Claimant was expected to complete 21 training videos on writing insurance estimates, but that Claimant only completed 1 of the videos. (N.T., 2/6/19, at 18-19.) Dinapoli also explained that he conducted separate coaching sessions with Claimant to improve her writing of insurance estimates, but that the estimates did not improve. *Id.*

Examining the foregoing testimony in the light most favorable to Employer and giving Employer the benefit of all inferences that can logically and reasonably be drawn from such testimony, as we must because the Board found in Employer's favor, *see United States Banknote Co.*, 575 A.2d at 674, we conclude there is substantial evidence in the record to support the Board's findings that Claimant failed to watch webinars and contact customers as instructed. *See* F.F. Nos. 5-8. Although Claimant argues that she was never given a concrete deadline to complete the webinars and never warned regarding her completion of the webinars, Bonella testified that she directed Claimant to watch a certain live webinar or its recording, by a particular date, but that Claimant failed to watch it. Bonella also testified that even though Claimant was instructed many times to contact customers to provide them with updates, Claimant only did so when prompted, but otherwise did not contact customers.

Additionally, although Claimant criticizes the Board for ignoring or discounting her testimony that she was too busy to complete the webinars, the Board

10

did not find Claimant's testimony "persuasive" in light of Employer's witnesses' testimony that employees were given the option to leave work early and watch the webinars on a tablet. (Board decision at 2-3.) Indeed, the Board explicitly stated that it "resolve[d] the conflicts in the testimony, in relevant part, in favor of [Employer] and [found] the testimony of [Employer] and its witness credible." (Board decision at 2.) As the arbiter of credibility, the Board was entitled to resolve such conflicts in the evidence in favor of Employer.

Similarly, Claimant also faults the Board for ignoring her testimony that she was able to do her job correctly, evidence that there were no written requirements for webinars, and evidence allegedly showing that she had received positive online reviews from customers. However, as the "ultimate fact finder" the Board was permitted to make its own determinations as to evidentiary weight, *Serrano*, 149 A.3d at 439, and thus, was free to discount Claimant's testimony regarding her job performance, as well as customer reviews that, while positive, ultimately, did not address the matters at issue, such as whether Claimant contacted customers on Tuesday and Thursday, as requested. *See* C.R. at Item No. 10, Claimant's Ex. No. 1. Likewise, the Board, in weighing the evidence, properly found that Claimant was required to complete the webinars, even if it was not an express written requirement. Thus, we are constrained to conclude that the Board's findings are supported by substantial evidence in the record.

Finally, Claimant contends that poor work performance cannot constitute willful misconduct. Claimant asserts that "mere incompetence, inexperience, or inability is not willful misconduct"; but rather, willful misconduct only occurs in a situation where a claimant refuses to change a "mode of operation in order to improve quality of work." (Claimant's Br. at 19.) Claimant contends that she never refused to comply with Employer's directives.

11

In contrast, the Board maintains that an employee's failure to work up to her full, proven ability, especially after multiple warnings regarding poor performance, constitutes willful misconduct because such conduct demonstrates an intentional disregard of the employer's interest. The Board argues that, here, Claimant's failure to contact customers was a conscious indifference to Employer's interests.

Section 402(e) of the Law provides that an employee shall be ineligible for UC benefits for any week in which her unemployment is due to willful misconduct connected to her work. 43 P.S. §802(e). Willful misconduct is defined as (1) wanton and willful disregard of an employer's interests; (2) deliberate violation of an employer's rules; (3) disregard of the standards of behavior that an employer can rightfully expect from an employee; or (4) negligence showing an intentional disregard of the employer's interest or the employee's duties and obligations. *Grieb v. Unemployment Compensation Board of Review*, 827 A.2d 422, 425 (Pa. 2003). Whether a claimant's conduct constitutes willful misconduct is a question of law fully reviewable by this Court on appeal. *Temple University of the Commonwealth System of Higher Education v. Unemployment Compensation Board of Review*, 772 A.2d 416, 418 n.1 (Pa. 2001). If an employer alleges misconduct because of a claimant's violation of a work rule, the employer must prove the existence of the rule and its violation, and the burden then shifts to the claimant to show good cause for her actions. *McKeesport Hospital v. Unemployment Compensation Board of Review*, 625 A.2d 112, 114 (Pa. Cmwlth. 1993).

In general, mere incompetence, inexperience, or inability of an employee to perform a job will not support a finding of willful misconduct. *Scott v. Unemployment Compensation Board of Review*, 36 A.3d 643, 647 (Pa. Cmwlth. 2012); *McCrea v. Unemployment Compensation Board of Review*, 487 A.2d 69, 70 (Pa. Cmwlth. 1985). Conversely, "[h]owever, it is well-established that an employee's failure to work up to his or her full, proven ability, especially after multiple warnings

12

regarding poor work performance, must be construed as willful misconduct because such conduct demonstrates an intentional disregard of the employer's interest or the employee's obligations and duties." *Scott*, 36 A.3d at 648; *see also McCrea*, 487 A.2d at 71 (holding that the claimant committed willful misconduct where the record evidence demonstrated that the claimant had previously performed her work at a satisfactory level, but that her recent work performance had progressively worsened and the claimant failed to improve despite repeated warnings); *Cullison v. Unemployment Compensation Board of Review*, 444 A.2d 1330, 1332 (Pa. Cmwlth. 1982) (same); *Ungard v. Unemployment Compensation Board of Review*, 442 A.2d 16, 19 (Pa. Cmwlth. 1982) (concluding that the claimant committed willful misconduct where, despite being reprimanded repeatedly regarding her poor work performance, she ignored the employer's instructions and resisted changing the manner in which she performed the work).

In *Scott*, the Board concluded that the claimant's poor work performance vis-à-vis cleaning surgical trays constituted willful misconduct. 36 A.3d at 647. On appeal to this Court, we noted that the claimant had been repeatedly warned regarding his poor work performance with respect to the cleanliness of the surgical trays he inspected. *Id.* at 648. In spite of the warnings, the claimant failed to properly inspect another tray. *Id.* We concluded that "[a]t the very least, [the claimant's] continued poor work performance demonstrated an *intentional disregard of the employer's interest of the employee's obligations and duties*," and, therefore, that the Board did not err in concluding that the claimant engaged in willful misconduct. *Id.* (emphasis added).

Here, Employer initially had no issues with Claimant's performance. However, beginning in June 2018, Employer began conducting regular coaching sessions with Claimant in an attempt to improve her performance regarding customer service and writing insurance estimates. Claimant was also specifically directed to

watch customer service webinars, wear the company t-shirt uniform, and contact customers every week, but did not do so.

Claimant was not discharged for mere incompetence, inexperience, or inability to perform her job, *see McCrea*, 487 A.2d at 70; instead, Claimant was discharged for failing to work up to her full, proven ability after repeated warnings regarding her poor work performance, *see Scott*, 36 A.3d at 648. Claimant was warned about her poor performance and instructed that she needed to improve her performance by watching the assigned webinars and regularly contacting customers. As in *Scott*, Claimant's failure to improve her performance by following Employer's directives demonstrated an "intentional disregard of [Employer's] interest or [Claimant's] obligations and duties." *Id.*

Accordingly, the Board did not err in concluding that Claimant engaged in willful misconduct.

 

 

_____
PATRICIA A. McCULLOUGH, Judge

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Cheryl Stanton,                      :
              Petitioner         :
                        :   No.  700 C.D. 2019
          v.                   :
                        :
Unemployment Compensation            :
Board of Review,                     :
              Respondent         :

# *__ORDER__*

AND NOW, this 6th day of May, 2020, the April 30, 2019 order of the Unemployment Compensation Board of Review is affirmed.

_____
PATRICIA A. McCULLOUGH, Judge